**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Beth Gokor,                                                        Case No. 3:16CV3038

              Plaintiff

        v.                                                        **ORDER**

Randall S. Schlievert, M.D.,

              Defendant

      This is a Fourth Amendment malicious-prosecution case under 42 U.S.C. § 1983.

      Plaintiff Beth Gokor was working at a daycare when a child under her supervision, three-year-old JJ, fell and broke his leg.

      A doctor who treated JJ suspected that his injury might involve "nonaccidental trauma" and contacted Lucas County Children Services (Children Services), a governmental agency that investigates cases of suspected child abuse. Children Services referred the matter to the defendant, Dr. Randall Schlievert, and asked him to prepare a report on JJ's injury.

      Dr. Schlievert, a private doctor who contracts with Children Services to evaluate possible child-abuse cases, concluded that JJ's injury was indeed "non-accidental." Acting in part on Schlievert's report, prosecutors indicted Gokor on a felony charge of child endangerment. Seven months later the prosecutor's office reversed course and dismissed the charge after an expert whom Gokor had hired debunked Schlievert's report.

      Gokor then brought this § 1983 suit, alleging that Dr. Schlievert set her prosecution in motion by preparing a false report that implicated her in JJ's injury.

Pending is Schlievert's motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). (Doc. 38). Construing that submission, as the parties urge me to do, as a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I deny Schlievert's motion.

## Background

### A. Injury

Gokor is a childcare provider with twenty years' experience. In September, 2014, she began working at Our First Love (First Love), a childcare center in Toledo that is open twenty-four hours per day, seven days per week. (Doc. 30 at ¶¶8, 13).

On December 28, 2014, Gokor arrived at First Love at 3:00 p.m. to begin her shift. (*Id.* at ¶14). Sometime before 5:00 p.m., one of Gokor's coworkers "mopp[ed] the daycare's linoleum bathroom floor with bleach and water" and finished her shift, leaving Gokor as the only adult to supervise the "two children, including JJ, [who] remained in the toddler room." (*Id.* at ¶¶17–18).

Around 6:00 p.m, Gokor told the children to wash their hands because it was time for dinner. (*Id.* at ¶22). Gokor was escorting the toddlers to the bathroom when "JJ took off running" toward the bathroom, where "his feet made contact with the previously washed linoleum floor." (*Id.* at ¶¶22–23). JJ "slipped, [his] legs came out from under him, his body went into the air, and JJ crashed to the floor." (*Id.* at ¶24).

While consoling JJ, Gokor realized that he could not walk or stand by himself. (*Id.* at ¶¶25–26). She carried him to the dining area, but JJ continued to cry and would not eat. (*Id.* at ¶28). Gokor felt JJ's left leg and noticed that it was swollen.

Gokor called First Love's owner, Mary Robinson, and its assistant manager, Rugena Modisett, and explained what had happened; the two supervisors rushed to First Love. (*Id.* at ¶¶31–37). JJ, meanwhile, "had calmed down and was falling asleep." (*Id.* at ¶36). When

Modisett finally spoke to JJ's mother (after several unsuccessful attempts to reach her), Modisett told her "she did not need to leave work to pick up JJ because he was beginning to fall asleep and . . . his injury was not serious." (*Id.* at ¶38). Gokor disagreed with that assessment but deferred to her superiors. (*Id.* at ¶39).

## B. Examination

JJ's mother picked him up from First Love at 10:15 p.m. and took him to Toledo Children's Hospital. (Doc. 30 at ¶¶40, 45). There Dr. Eugene Iszak ordered an X-ray, which revealed "an acute left femur fracture." (*Id.* at ¶¶47–48). JJ told a physician's assistant that he "slipped and fell." (*Id.* at ¶55) (internal brackets omitted).

Because "the injury happened at daycare, the hospital [determined to] treat the injury as 'possible nonaccidental trauma.'" (*Id.* at ¶49). Dr. Iszak told JJ's mother that Children Services "would be contacted to investigate the circumstances surrounding JJ's injury." (*Id.* at ¶50). But "[a]t no point did any Toledo Hospital medical personnel ever diagnose JJ as suffering from non-accidental trauma," nor did anyone express doubt that the fall Gokor described could have caused JJ's injury. (*Id.* at ¶59).

## C. Investigation

In mid-January, 2015, Gokor submitted to an interview with Detective Tonya Rider of the Toledo Police Department and Children Services Investigator Kim Fraber. (Doc. 30 at ¶89).

After Gokor explained how JJ had fallen and denied all wrongdoing, Fraber told her that Dr. Schlievert "would look at the [evidence], make a determination, and issue a report." (*Id.* at ¶98). Fraber acknowledged that "[a] lot of my investigation is going to be the outcome of what [Schlievert] has to say[.]" (*Id.* at ¶99). Fraber also said that "[w]e rely on" Schlievert's expertise because she and Detective Rider did not "have that medical expertise[.]" (*Id.* at ¶104).

## 1. Referral to Schlievert

Sometime in early January, 2015, Children Services "referred JJ's case" to Schlievert "for investigation pursuant to [a] contract for [his] services entered into by Lucas County." (Doc. 30 at ¶78).

Dr. Schlievert is "board certified in general pediatrics and child abuse pediatrics." (*Id.* at ¶9). He is also "the sole physician contracted by Lucas County . . . to provide forensic medical consultation services to Lucas County agencies concerning cases of physical abuse and to provide expert testimony in legal proceedings instituted by Lucas County agencies." (*Id.*). Schlievert "does not maintain a pediatric practice and does not treat pediatric patients outside of the context of child abuse investigations." (*Id.* at ¶88).

### a. Schlievert's Relationship with Lucas County and Its Agencies

Ohio law requires that agencies like Children Services "investigate each report of possible physical abuse [of a child] it receives to determine the circumstances surrounding the injuries, the cause of the injuries, and the person or persons responsible." (Doc. 30 at ¶60).

State law also requires that such agencies "prepare a memorandum of understanding" for investigating child-abuse cases. (*Id.* at ¶61).

This memorandum sets forth the "operating procedure to be employed" in cases of suspected child abuse, as well as the "standards and procedures to be used in handling and coordinating investigations of reported cases of child abuse." (*Id.* at ¶¶63–64). Signatories include "law enforcement officers[,] the prosecuting attorney of the county, and each member of any children's advocacy center established within the county." (*Id.* at ¶62); *see also* O.R.C. §§ 2151.421(K) & 5101:2-33-26(B).

In Lucas County, the Family and Child Abuse Prevention Center (the Abuse Prevention Center), located in Toledo, functions as the county's designated child advocacy center. (Doc. 30 at ¶¶65–66).

The Abuse Prevention Center maintains a "Protocol for Multidisciplinary Response to Child Abuse," which aims "to provide the community with a coordinated, multidisciplinary, and sensitive approach to child abuse [cases]." (*Id.* at ¶68). Under this protocol, the Child Maltreatment Program at Mercy Children's Hospital is the entity responsible for "medical evaluations, which includes history, examination, appropriate diagnostic studies, and treatment of victims by a physician with specialized training in child abuse." (*Id.* at ¶70).

The complaint alleges that Dr. Schlievert, whose office is located in the Abuse Prevention Center, "is the physician referred to in the protocol." (*Id.* at ¶71).

A contract between Children Services and Mercy St. Vincent Medical Center "for the services of [Mercy St. Vincent's] employee" – Dr. Schlievert – obliges Schlievert to "represent[ ] and promot[e] the philosophy of [Children Services] to community medical providers and hospitals, provide[ ] written documentation of physical examination for abuse and neglect to the appropriate caseworker as identified by [Children Services] where such documentation can be used as court evidence, and participate in court hearings, as requested by [Children Services] to provide testimony regarding abuse and neglect." (*Id.* at ¶¶72, 75) (internal quotation marks and brackets omitted).

### b. Schlievert's Report

On January 8, and at Fraber's request, Schlievert issued a report concluding that JJ's injuries were "non-accidental." (Doc. 22; Doc. 30 at ¶109). He based his findings on Fraber's

"case notes, the day care incident report, X-rays and medical records from Toledo Hospital."

(Doc. 22 at 1).

According to Schlievert:

> the history does not adequately account for [JJ's] injury. In addition, improbable statements by the daycare were made. [JJ] would not have been able to stand. The daycare failed to alert family to the obvious severe injury, prolonging pain as well. This injury is non-accidental.

(*Id.* at 1).

Schlievert recommended that JJ not return to First Love, and that Children Services refer First Love to "the state agency charged with daycare licensure" because "[c]hildren do not appear to be currently safe there." (*Id.* at 2). Schlievert's report did not, however, identify any particular First Love employee as responsible for JJ's injury, nor did it mention Gokor by name. (*Id.* at 1–2).

When Schlievert prepared this report, Gokor alleges, he knew that police and prosecutors "relied on his findings when making decisions about how to proceed on cases involving allegations of physical abuse" and used his reports "as the basis to bring about criminal charges and . . . to initiate criminal proceedings." (*Id.* at ¶¶81–82). He also knew that police and prosecutors would share his report among themselves while investigating Gokor. (*Id.* at ¶82).

### 2. Gokor's Firing, Indictment, and Release

After Schlievert sent his report to Investigator Fraber, she contacted First Love and explained that Gokor "could not [*sic*] longer work with children." (Doc. 30 at ¶107). First Love immediately fired Gokor. (*Id.* at ¶108).

Rider and Fraber continued their investigation after receiving Schlievert's report. During their second interview with Gokor, she again denied all wrongdoing. (*Id.* at ¶¶122–31). The investigators also learned that: 1) Modisett claimed to have told JJ's mother that it was her

choice whether to pick up JJ immediately, thereby contradicting Gokor's and JJ's mother's statements that daycare management told her that she need not come to First Love right away (*id.* at ¶121); 2) there were cameras inside First Love, but it was unclear whether they were working when JJ fell (*id.* at ¶130); 3) JJ told his mother that he hurt himself because "he was running and fell" (*id.* at ¶134); and 4) Gokor's coworker did, in fact, mop the bathroom floor before completing her shift (*id.* at ¶137).

Knowing all the foregoing, Detective Rider prepared a report for the prosecutor's office that emphasized Schlievert's "medical opinion that the victim's injuries are non-accidental." (*Id.* at ¶140).

In March, 2015, a grand jury in the Lucas County Common Pleas Court "returned a true bill" that charged Gokor with "Endangering Children" under O.R.C. § 2919.22(E)(2). (*Id.* at ¶¶142–43). Gokor alleges on information and belief that either Schlievert testified before the grand jury that JJ's injury was non-accidental or that "[l]aw enforcement testified . . . to the content of" Schlievert's report. (*Id.* at ¶148).

According to Gokor, "the grand jurors' probable cause determination was based upon" Schlievert's report. (*Id.* at ¶150). Gokor alleges that, absent the report – which was "fabricated, false, and misleading" – the grand jury would not have had probable cause to indict her. (*Id.* at ¶152). She voluntarily surrendered and was arrested on April 1, 2015, more than four months after JJ's injury; at her arraignment, Gokor pleaded not guilty. (*Id.* at ¶¶154–58). She made bond the same day as her arrest. (*Id.* at ¶¶157–58).

During pretrial proceedings, Gokor's attorney obtained an expert report from radiologist Gregory Shoukimas. Dr. Shoukimas concluded that JJ's injury was accidental and that Schlievert's report was riddled with errors. (*Id.* at ¶162).

Shoukimas opined that "[s]piral fractures of the femur" of the kind JJ sustained "can occur from accidental injury and there is no need to invoke a theory of nonaccidental injury to explain" such a fracture. (*Id.* at ¶163). Dr. Schlievert's conclusion that "this fracture is not compatible with accidental trauma" was, in Shoukimas's view, "fallacious" and "disregard[ed] . . . the recorded interviews between the police, [Gokor], her co-workers, and JJ's mother." (*Id.*).

In November, 2015, after defense counsel provided Shoukimas's report to the prosecution, prosecutors dismissed the charges against Gokor without prejudice. (*Id.* at ¶167).

### D. Litigation

In late 2016, Gokor filed this § 1983 action against Dr. Schlievert and Lucas County, Ohio. (Doc. 1). She brought two Fourth Amendment claims against Schlievert and alleged that the County was liable for the constitutional violations under *Monell v. Dept' of Soc. Servs.*, 436 U.S. 658 (1978). Gokor then filed an amended complaint. (Doc. 30).

After Gokor and Lucas County stipulated to a dismissal of the County without prejudice (Docs. 36, 41), Dr. Schlievert moved for judgment on the pleadings. (Doc. 38). Gokor opposed the motion, but withdrew her claim that Schlievert's allegedly false report had caused Gokor to be arrested, and then incarcerated, without probable cause. (Doc. 43 at 1).

The only claim that remains is Gokor's allegation that Schlievert set her prosecution in motion with a false report that Gokor was responsible for JJ's broken leg.

### Standard of Review

Federal Rule of Civil Procedure 12(c) provides that, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."

Both parties agree that Schlievert's Rule 12(c) motion is premature, given that the pleadings are not closed because Schlievert has not filed an answer. *Horen v. Bd. of Educ. of*

*Toledo Sch. Dist.*, 594 F. Supp. 2d 833, 840 (N.D. Ohio 2009) (Carr, J.). They also agree, as do I, that I can and should treat Schlievert's motion as a motion to dismiss under Fed. R. Civ. P. 12(b)(6). (Doc. 43 at 8; Doc. 45 at 2); *see also Horen*, *supra*, 599 F. Supp. 2d at 840.

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## Discussion

Gokor claims that Dr. Schlievert violated her Fourth Amendment rights by preparing and submitting to law-enforcement authorities a false, fabricated, and materially misleading report implicating her in JJ's supposedly "non-accidental" injury.

To prevail on a § 1983 claim, the plaintiff must establish that a person acting "under color of state law . . . caused the violation of a federal right." *Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 612 (6th Cir. 2018). Dr. Schlievert, however, is a private party, not a government employee. The viability of Gokor's malicious-prosecution claim therefore turns on whether Gokor has plausibly alleged that Schlievert acted under color of state law.

### A. State Action

"Private action . . . may . . . count as state action under discrete circumstances[,]" *id.*, as long as the private conduct "causing the deprivation of a federal right may be fairly attributable to the state." *Revis v. Meldrum*, 489 F.3d 273, 289 (6th Cir. 2007). The Sixth Circuit uses "three tests to resolve the state-actor inquiry: the public-function test, the state-compulsion test, and the nexus test." *Carl v. Muskegon Cnty.*, 763 F.3d 592, 595 (6th Cir. 2014).

The parties dispute whether Schlievert is a state actor under the public-function and nexus tests.

## 1. Public Function

Liability arises under the public-function test if "the private individual exercises powers which are traditionally exclusively reserved to the state." *Carl*, *supra*, 763 F.3d at 595.

The Sixth Circuit interprets this test "narrowly," such that "[o]nly functions like holding elections, exercising eminent domain, and operating a company-owned town fall under this category of state action." *Chapman v. Higbee Co.*, 319 F.3d 825, 833–34 (6th Cir. 2003) (internal citations omitted).

"[S]imply alleging in a complaint" that a defendant's conduct "is traditionally exclusively in the province of the State is no longer, if it ever was, sufficient to survive a motion to dismiss." *Marie v. American Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014). Rather, the plaintiff must "advance historical and factual allegations . . . giving rise [to] a reasonable inference that [the defendant's conduct] is traditionally exclusively in the province of the State." *Id.*

Dr. Schlievert argues that he is not a state actor under this rubric because the function he performed – "receiving and reviewing medical records to provide medical consultation services for possible child abuse" (Doc. 38 at 16) – is not something society has traditionally and exclusively reserved to the state. In support, Schlievert relies on *Molnar v. Care House*, 574 F. Supp. 2d 772, 784 (E.D. Mich. 2008), *aff'd on other grounds*, 359 F. App'x 623 (6th Cir. 2009), which held that a forensic interview of an alleged child-sexual-abuse victim was not "exclusively within the power of the state."

Gokor contends that Schlievert performed the exclusive state function of "not effectuat[ing] arrests and pursu[ing] prosecutions" of suspected child abusers "absent probable cause[.]" (Doc. 43 at 13).

According to Gokor, "divisions of the State charged with effectuating arrests and pursuing prosecutions have a constitutional obligation, under the Fourth Amendment, to not arrest and prosecute its citizens absent a showing of probable cause." (*Id.* at 11). Lucas County, Gokor continues, employs "persons with specialized knowledge, including forensic examiners" like Dr. Schlievert "in order to fulfill this constitutional obligation" in child-abuse cases. (*Id.*).

Because the County delegated these functions, as well as its "affirmative duty to investigate allegations of physical abuse," to Schlievert, Gokor contends that he is a state actor under the public-functions test. In support, Gokor invokes the framework of *West v. Atkins*, 487 U.S. 42 (1988), which held that a private physician who contracted to provide medical care to prison inmates performed a public function.

I disagree. Even viewing the complaint in the light most favorable to Gokor, her allegations that Schlievert performed a traditional state function are implausible.

Most importantly, there are no "historical and factual allegations in the[ ] complaint giving rise [to] a reasonable inference," *Marie*, *supra*, 771 F.3d at 362, that examining the records of an allegedly abused child and forming a medical opinion – even if done entirely in service to an ongoing police investigation and probable prosecution – "is traditionally exclusively in the province of the State."

Indeed, the complaint does not allege that the Ohio General Assembly has charged Children Services with exclusive responsibility for protecting endangered children, and, as part of that exclusive function, acquiring medical opinions in cases of alleged abuse. *See Cleary v.*

*Cnty. of Macomb*, 2007 WL 2669102, *10 (E.D. Mich. 2007) (dismissing a § 1983 complaint where such allegations were absent and concluding that "providing a medical opinion in an ongoing investigation of sexual abuse has not been a power traditionally reserved exclusively to the state or the County of Macomb").

All the complaint suggests is that the State of Ohio and Lucas County are currently responsible for investigating suspected child abuse, and that the County contracts with, *inter alia*, Schlievert's employer, Mercy St. Vincent Medical Center, for Schlievert to perform a key part of those investigations. Though the complaint can be read to assert that Schlievert is the County's "go-to" doctor, it does not indicate whether, for example, the General Assembly allows private entities to perform the same functions, including forensic examinations, that Children Services fulfills in Lucas County – i.e., that on a statewide basis, the General Assembly has imposed those functions solely on public agencies, and that it has done so historically.

For these reasons, the complaint is insufficient to establish that Dr. Schlievert is a state actor under the public-function test. *Marie*, *supra*, 771 F.3d at 362; *see also Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003) (rejecting public-function argument because "[p]laintiff advance[d] no historical argument in support of his allegations").

Furthermore, Gokor's analogy to *West* is not persuasive.

In that case, a private doctor performed a function that the Constitution delegated exclusively to state governments: providing medical care to prisoners in the state's custody. *West*, *supra*, 487 U.S. at 54.

Here, by contrast, the complaint does not allege a similarly exclusive and historical duty to conduct forensic examinations as part of an investigation coming in the wake of a report of suspected child abuse. It seems, in any event, conceivable that private doctors have conducted

such evaluations outside the context of a government-controlled investigation into child abuse, whether in regard to divorce proceedings, a victim's subsequent psychological or psychiatric therapy, or otherwise. *Cf. Molnar*, *supra*, 574 F. Supp. 2d at 784 ("There are many private investigators, and social workers, who perform investigative interviews.").

Gokor's analogy to *West* founders in light of these omissions. *Cf. Brent v. Wayne Cnty. Dep't of Human Servs.*, --- F.3d ----, 2018 WL 4016607, *8 (6th Cir. 2018) (private entities that supervised foster children whom the state had removed from their parents' homes were state actors under *West* because the state was "constitutionally obligated to protect children who are wards of the state from the infliction of unnecessary harm").

## 2. Nexus

"Under the symbiotic or nexus test, a section 1983 claimant must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself." *Chapman*, *supra*, 319 F.3d at 834. "[I]t must be established that the State is intimately involved in the challenged private conduct in order for that conduct to be attributed to the state[.]" *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992).

Schlievert argues that no such nexus exists because Gokor did not plead that "the state supervises, directs, or otherwise involves itself with [his] medical consultation services[.]" (Doc. 38 at 17).

According to Schlievert, Gokor offers "little more than speculation and [a] hodge-podge of various code provisions and supposed protocols and contracts" to establish a nexus between his private conduct and that of Lucas County and its agencies. (Doc. 45 at 7). But Schlievert

insists that Gokor never actually "explains them or demonstrates that [he] is acting under color of state law in his role as independent contractor." (*Id.*).

Gokor contends that a sufficient nexus exists because "the scope and motivation for [Dr. Schlievert's] investigation [of JJ's injury] were established solely by the County's investigatory goals and obligations[.]" (Doc. 43 at 14). In other words, "Schlievert rendered his report only because the County sought his assistance with the analysis of evidence in the criminal and child protective investigation." (*Id.*).

Gokor emphasizes that Schlievert was "contractually obligated to review and interpret the evidence because of his contract with the County." (*Id.*). She also notes that a contract between Children's Services, Mercy St. Vincent Medical Center, and Schlievert required Schlievert to document his "physical examination[s] for abuse and neglect" and provide such documentation to Children Services caseworkers. (Doc. 30 at ¶75; Doc. 43 at 14).

Finally, Gokor points to provisions of Ohio law requiring that "abuse investigations undertaken by public children services agencies be made in cooperation with law enforcement." (Doc. 43 at 15).

There is "no clear standard for identifying" whether Gokor's allegations establish a "sufficiently close nexus" to transform Dr. Schlievert's conduct into state action. *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000). "What is fairly attributable" to the State is, and must remain, "a matter of normative judgment." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

In this case, however, Gokor has sufficiently and plausibly alleged "a sufficiently close nexus" between the State's handling of child-abuse investigations and Dr. Schlievert's forensic examinations as to make those examinations "attributable to the State."

Dr. Schlievert examines children who may have been victims of abuse, reviews their medical records and other pertinent documents, and forms an opinion about the nature of their injuries for one reason, and one reason only: he has a contractual obligation to Children Services to do so. (Doc. 30 at ¶¶72–75).

As the complaint establishes, Schlievert "does not maintain a pediatric practice and does not treat pediatric patients outside of the context of child abuse investigations." (*Id.* at ¶88). Dr. Schlievert protests that this allegation is impermissibly conclusory, yet it is anything but conclusory. It states a fact about the nature of his practice setting. That factual assertion is one that seems consistent with, and plausible in light of, the complaint's other allegations about Schlievert's extensive involvement with government agencies that investigate child abuse.[1]

Schlievert's examinations occur, then, not because he in his capacity as a physician sees a medical need for them, but, rather, because a State-created and State-controlled framework mandates that he do so.

This framework comprises, *inter alia*, the memorandum of understanding, which sets forth "standards and procedures to be used in handling and coordinating" child-abuse investigations, and to which police, prosecutors, and Lucas County's child advocacy center – the Abuse Prevention Center, where, in fact, Schlievert's office is located – are signatories (Doc. 30 at ¶¶61–64, 65–67).

It also comprises the Abuse Prevention Protocol, which assigns to Schlievert's employer, Mercy St. Vincent Medical Center, the responsibility for "medical evaluations" of potential

_____

[1] I note that Schlievert did not deny this allegation in his answer, but claimed to lack "knowledge or information sufficient to form a belief as to the truth of th[at] allegation[.]" (Doc. 12 at ¶22).

victims (*id.* at ¶¶70–72). The Protocol, of course, designates Dr. Schlievert as the physician responsible for performing the evaluations. (*Id.* at ¶¶70–71).

When Schlievert conducts these contractually required evaluations, he creates a report summarizing his findings because, again, his contract with Children Services requires him to do so. (*Id.* at ¶75). He creates the reports, moreover, knowing that police and prosecutors will share the reports among themselves and rely on them to make decisions about whom to arrest and what charges to bring. (*Id.* at ¶¶82–84).

In this respect, then, Schlievert's challenged conduct overlaps entirely with the State's motivations and goals. He functions as a critical player in the State's comprehensive – and entirely understandably comprehensive – efforts to combat child abuse, one on whom other arms of the state – Children Services, police departments, and prosecutors – depend and from whom they take their investigatory and charging cues.

As one court has aptly put it, someone like Dr. Schlievert – a private doctor to whom the State has essentially turned over the responsibility for providing a medical basis to support or refute a claim of possible child abuse – is "truly . . . close[ly] entwine[d]" with the State for purposes of § 1983's state-action requirement:

> [I]t is not merely tautological, but rather a truism, to recognize that a "state actor" is someone who participates in "state action" in a meaningful way. Take the governmental function of seeking to prevent, or to deal with, child abuse. It would of course be intolerable to permit amateurs – lay personnel – to reach judgments independent of skilled medical evaluations and to make those amateur judgments the basis for separating children from their parents. Instead the expertise of medical professionals necessarily plays a key role – in many ways, the most important role – in evaluating both the effects and the causes of child abuse.
>
> In short, it cannot be disputed that the governmental task in the field of child abuse could not function responsibly without the invaluable input provided by medical professionals. And when those professionals are not themselves governmental employees, it is equally beyond dispute that the interrelationship between those professionals and the purely governmental people involved in the

decisionmaking process is truly a close entwinement (the word repeatedly used in *Brentwood* Academy as meeting the state-actor test). Whether because the recruiting of top people to fulfill the medical professionals' function on a full-time basis would not have been feasible, or for some other reason or congeries of reasons, that is obviously why the Committee contracted for such service from Dr. Glick and the Hospital, rather than hiring staff doctors (who would by definition have been "state actors").

*Mohil v. Glick*, 842 F. Supp. 2d 1072, 1077 (N.D. Ill. 2012); *accord Billups v. Penn State Milton S. Hershey Med. Ctr.*, 910 F. Supp. 2d 745, 757 (M.D. Pa. 2012) (private doctors who examined child in county's custody "for the purpose of determining whether her injuries were the result of criminal activity" were state actors under the nexus test); *A.P. v. Medina*, 2018 WL 2546195, *3 (D.N.J. 2018) (private doctor who was "the primary medical investigator on behalf of the State" and examined a child "to determine whether his injuries resulted from abuse" was a state actor under the nexus test).

Dr. Schlievert's best argument that his conduct is not fairly attributable to the State is that Gokor has not alleged that any state entity exercise control over, or influences how, he evaluates potential child-abuse victims. (Doc. 38 at 17). In other words, as far as the complaint is concerned, Schlievert is free to exercise his independent medical judgment during such evaluations to reach whatever conclusion he deems appropriate.

While that may be true, it remains the case that Dr. Schlievert's evaluations are not private medical functions. They are, the complaint alleges, necessary components of a comprehensive government framework for investigating and resolving cases of suspected child-abuse. They have no independent medical value aside from their serving as a predicate for a child-abuse investigation by the police and an indictment by the prosecutor. That Schlievert retains discretion in how he performs state action does not mean his conduct is no longer "fairly attributable to the state."

Finally, and for similar reasons, I do not find *Molnar*, *supra*, on which Schlievert heavily relies, to be controlling or persuasive here. The court in *Molnar* held that a private forensic examiner who questioned an alleged victim of sexual abuse while police and prosecutors looked on was not a state actor under the nexus test. 574 F. Supp. 2d at 785–86.

This case is different, however. Schlievert did not simply question an abuse victim about his injuries and let the authorities draw their own conclusions; he drew the conclusions, put them in a report (as his contract required), and sent them (as his contract also required) to Children Services and Toledo Police investigators who had previously admitted that Dr. Schlievert's opinion would determine the outcome of their investigation and who subsequently prepared a report for the prosecutor that emphasized Schlievert's opinion.

In sum and substance, then, Dr. Schlievert is a state actor.

### B. Malicious Prosecution

Having concluded that Dr. Schlievert is a state actor, I turn to the merits.

To state a Fourth Amendment malicious-prosecution claim, the plaintiff must establish four elements: 1) "a criminal prosecution was initiated against the plaintiff," and "the defendant made, influenced, or participated in the decision to prosecute"; 2) there was no probable cause for the prosecution; 3) "as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and 4) "the criminal proceedings must have been resolved in the plaintiff's favor." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (internal brackets and ellipses omitted).

Dr. Schlievert does not dispute that Gokor has satisfied the third and fourth elements.

He contends, however, that Gokor has not plausibly alleged that he influenced or participated in the decision to prosecute her, or that probable cause was otherwise lacking.

## 1. Influence and Participation

Schlievert contends that Gokor's complaint contains only "bald assertions" as to his alleged participation in or responsibility for the decision to prosecute her (Doc. 38 at 24), but this argument has no merit.

As discussed, *supra*, the complaint alleges that Schlievert is the sole physician to whom the County and Children Services refer suspected child-abuse cases. Gokor also alleges that Children Services relies on him to render a medical opinion in such cases, and that investigators thereafter take their cue from his findings and conclusions. (Doc. 30 at ¶¶9, 78, 81–82, 88).

The complaint also alleges that Dr. Schlievert prepares his reports knowing that police and prosecutors have shared, and will continue to share, them among themselves, and that they have relied, and will continue to rely on, his reports when deciding whom to arrest and whom to indict. (*Id.* at ¶¶81–82). His contract in fact *requires* that he document his findings and "provide" that documentation to Children Services caseworkers so that the document can, *inter alia*, "be used as court evidence." (*Id.* at ¶75).

It was precisely this process, the complaint establishes, that played out in Gokor's case.

Children Services "referred JJ's case" to Dr. Schlievert "for investigation[.]" (Doc. 30 at ¶78). Investigator Fraber and Detective Rider, meanwhile, suspected Gokor of wrongdoing, but confessed themselves unable to determine – and indeed incapable of determining – whether JJ's injury was accidental or non-accidental. (*Id.* at ¶¶99, 104). Only after receiving Schlievert's report, which blamed Gokor – not by name, to be sure, but by obvious implication – for causing the "non-accidental" injury, did Rider prepare a report for the prosecutor's office emphasizing Dr. Schlievert's opinion.

These facts, which I assume to be true for purposes of this opinion, establish that Schlievert influenced or participated in the decision to prosecute Gokor.

As the Circuit explained in *Mills, supra*, 869 F.3d at 482, "[i]nvestigators are deemed to have participated in a prosecution where misstatements and falsehoods in [their] investigatory materials . . . ultimately influenced [the plaintiff's] continued detention." That is what Gokor alleged happened in this case.

### 2. Probable Cause

In most cases, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002). But the Circuit has recognized an exception to this rule for cases where the defendant who set the plaintiff's prosecution in motion knowingly or recklessly made a false statement. The otherwise conclusive presumption becomes rebuttable when:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury)[.]

*King v. Harwood*, 852 F.3d 568, 587–88 (6th Cir. 2017).

### a. False Statement

First, the complaint plausibly alleges that Dr. Schlievert knowingly and/or recklessly made two false statements: "[t]he history does not adequately account for the injury," and "[t]his injury was nonaccidental. (Doc. 30 at ¶¶169–87).

According to the complaint, JJ's fracture was consistent with accidental trauma, the fall Gokor described could have caused such a fracture, and nothing in the fracture pattern

definitively established that the break was non-accidental. (*Id.* at ¶113). On top of this, Dr. Schlievert admitted in his answer that he "knew that femoral fractures have been described in children who fell while running." (Doc. 12 at ¶33). Finally, JJ twice stated – once to a hospital worker, and once to his mother – that he hurt himself when he was running and fell. (*Id.* at ¶134).

In reviewing JJ's case, Schlievert was contractually obliged to "tak[e] necessary steps to ensure that he had access to all documents used to establish the facts of JJ's injuries" (Doc. 30 at ¶177). But Gokor alleges that Dr. Schlievert failed to do this. In particular, she alleges that Schlievert did not observe either of law enforcement's interviews of Gokor, nor did he consider their interviews of Gokor's coworkers. (*Id.* at ¶¶92–93, 119, 121, 131).

Perhaps most importantly, Gokor alleges that Schlievert did not review Detective Rider's notes of her interview of JJ's mother, during which interview the mother said that JJ told her "he was running and fell, and mentioned an ice pack." (*Id.* at ¶134). Indeed, Dr. Schlievert's report conspicuously fails to mention either of JJ's statements that he slipped and fell while running, let alone provide a plausible medical basis for rejecting a putative victim's repeated accounts of his injuries.

As Gokor correctly points out, her complaint yields at least two plausible inferences. Either Schlievert conducted a thorough review of the records and evidence, much of which suggested that the injury was accidental, and falsely represented that it was "non-accidental" or he failed to do his due diligence and, lacking a proper command of the exculpatory facts of the case and in the face of an obvious, non-criminal explanation for JJ's injury, invented an inculpatory account.

### b. Materiality

Second, the complaint plausibly alleges that Dr. Schlievert's report was "material to the ultimate prosecution" of Gokor. *King*, *supra*, 852 F.3d at 587. Most simply put, Schlievert's report was the only basis for concluding that JJ's injury was non-accidental, and it was the only basis to conclude that Gokor had abused JJ and caused his injury. *See infra* at 22–23.

### c. Lack of Probable Cause

Finally, the complaint plausibly alleges that, absent Dr. Schlievert's report, there was no probable cause to prosecute Gokor for child endangerment.

Prosecutors charged Gokor with child endangerment under O.R.C. § 2919.22(E)(2), which makes it a second-degree felony to "'abuse' a child, thereby causing the child to suffer 'serious physical harm.'" *State v. Cunningham*, 93 N.E.3d 25, 30 (Ohio App. 2017). The nature of JJ's injury would seem to satisfy the "serious physical harm" requirement, but only Dr. Schlievert's report supported the "abuse" element.

To begin, no medical personnel who treated JJ at Toledo Children's Hospital determined that physical abuse *caused* JJ's injury. Rather, hospital staff flagged the injury as "*possible*" non-accidental trauma and referred the matter to Children Services for an investigation. (Doc. 30 at ¶¶49 (internal emphasis supplied); *see also id.* at ¶¶57, 59). JJ himself, moreover, told both a physician's assistant at the hospital and his mother that he broke his leg after he "slipped and fell." (*Id.* at ¶¶55, 134). Even Schlievert agreed that such a fall could account for JJ's injury. (Doc. 12 at ¶33).

Detective Rider and Investigator Fraber investigated the matter, but they dug up very little, if anything, that implicated Gokor in suspected "abuse."

Gokor consistently denied any wrongdoing. (Doc. 30 at ¶¶91, 123). One of Gokor's coworkers told the investigators that she had, in fact, mopped the bathroom floor about an hour before JJ slipped and fell, just as Gokor had said. (*Id.* at ¶137). JJ's mother corroborated Gokor's statement that it was the manager, not Gokor, who told her that JJ's injury was not serious, and that there was no need for her to come get JJ right away. (*Id.* at ¶121).

Setting aside Dr. Schlievert's report, this body of evidence, such as it was, formed the sum total of the case against Gokor. Yet there is nothing in it suggesting that Gokor had "abused" JJ – i.e., that she had inflicted a non-accidental injury upon JJ – as would be required to have probable cause that she committed the offense of child endangerment.

Schlievert's response that probable cause for the endangerment charge existed without his report (Doc. 45 at 17–18) lacks merit.

That JJ's treating physicians at Toledo Children's Hospital "were concerned with a *potential* for child abuse" (*id.* at 17) (internal emphasis supplied) does not amount to a reasonable basis to believe that Gokor abused JJ; it amounted to "mere suspicion." *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010).

Schlievert also asserts that there were "numerous suspicious statements about [JJ's] condition after his injury, such as his supposed ability to walk on a complete spiral femur fracture, and statements that the injury was not serious." (*Id.*). He does not explain how those statements inculpate Gokor, who never said that JJ was able to walk and who disagreed with her superiors' decision to tell JJ's mother that his injury was not urgent.

\* \* \*

For all of these reasons, Gokor has plausibly rebutted the presumption of probable cause that her indictment created.

## C. Causation

"The causation requirement in § 1983 is not satisfied by mere causation in fact; the plaintiff must also establish proximate causation." *Molnar*, *supra*, 574 F. Supp. 2d at 786.

Dr. Schlievert argues that Gokor cannot establish proximate cause because Schlievert's report did not name Gokor as the person responsible for JJ's injury. (Doc. 45 at 18–20). To make his point, Schlievert asks a rhetorical question: "if Dr. Schlievert never identified Plaintiff, and if he did not know who [at First Love] did and did not make the suspicious statements [about JJ's injuries] – and if law enforcement and prosecutors *did* – how is it that Dr. Schlievert caused Plaintiff to be arrested and prosecuted?" (*Id.* at 19) (emphasis in original).

Although Dr. Schlievert wasn't looking for an answer to his rhetorical question, Gokor's complaint supplies one.

Detective Rider and Investigator Fraber had homed in on a suspect – Gokor, the only adult present at First Love when JJ was injured. But the investigators were admittedly unable to determine if she had "abused" JJ within the meaning of the child-endangerment statute, as they did not know whether the fall Gokor described could account for JJ's fractured leg. They therefore turned to Schlievert to answer that question, and he prepared an allegedly fabricated report concluding that JJ's injury was non-accidental.

By supplying the inculpatory report, and by knowingly and/or recklessly making false statements that necessarily implicated Gokor, the police's only suspect, Dr. Schlievert's conduct was a proximate cause of Gokor's injury. That he did not identify her by name is immaterial.

**Conclusion**

It is, therefore,

ORDERED THAT:

1.      Defendant's motion to dismiss (Doc. 38) be, and the same hereby is, denied; and

2.      The clerk shall forthwith set this case for a telephonic status/scheduling

conference.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge
